FILED
United States Court of Appeals
Tenth Circuit

May 7, 2014

Elisabeth A. Shumaker
Clerk of Court

UNITED STATES COURT OF APPEALS

FOR THE TENTH CIRCUIT

DOREL ILIOI,

        Petitioner,

v.

ERIC H. HOLDER, JR.,
United States Attorney General,

        Respondent.

No. 13-9575
(Petition for Review)

**ORDER AND JUDGMENT**[*]

Before **LUCERO** and **McKAY**, Circuit Judges, and **BRORBY**, Senior Circuit Judge.

Dorel Ilioi seeks review of a final order of removal issued by the Board of

Immigration Appeals (BIA) affirming the decision of the Immigration Judge (IJ)

denying his applications for asylum and restriction on removal under the Immigration

and Nationality Act (INA) and for protection under the United Nations Convention

---

[*]    After examining the briefs and appellate record, this panel has determined unanimously to grant the parties' request for a decision on the briefs without oral argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

Against Torture (CAT).  Exercising jurisdiction under 8 U.S.C. § 1252(a), we dismiss in part and deny in part the petition for review.

## I.  Background

Mr. Ilioi, a native and citizen of Romania, entered the United States in November 2000 on a non-immigrant B1/B2 visa, with authorization to stay for a temporary period not to exceed one year.  Because he remained longer without authorization, the Department of Homeland Security commenced removal proceedings against him in June 2007.  In April 2008, Mr. Ilioi applied for relief in the form of asylum, restriction on removal, and protection under the CAT, claiming religious persecution.

At a hearing before an IJ, Mr. Ilioi testified that he was born in a small village in Romania, under the Communist regime.  He is a member of the Pentecostal Church, a minority religion in Romania comprising less than 2% of the population, as is his family in Romania.  The majority religion in Romania, practiced by approximately 90% of the population, is the Romanian Orthodox Church.  Mr. Ilioi's claim of past persecution is premised on incidents that occurred during his childhood in Romania.  He explained that between the ages of six and twelve, he was ridiculed at school by students and teachers for his Pentecostal beliefs and sometimes beaten. His parents were arrested several times for distributing Bibles and fined.  He also described an incident where he, his family members, and others protested the attempted demolition of his church by Romanian authorities by camping out inside

the church for three days.  After arriving in the United States, Mr. Ilioi attended a seminary over a five-year period to become a pastor.  He was ordained as a pastor bishop in 2006, and is currently a pastor of the Romanian Pentecostal Church in Denver, Colorado.

Seventeen years after the fall of Communism in Romania in 1989, the Romanian government passed a new religion law in 2006, which became effective in January 2007 ("Religion Law").  The record evidence demonstrates that the Religion Law, opposed by minority religious groups, implemented a three-tier hierarchical system of recognition:  religious groups, religious associations, and religions.  According to Mr. Ilioi, the Religion Law was promulgated to "shut the mouth of the foreigners," R. at 208, but in reality it divided religion in Romania in two – recognizing the Orthodox Church as the main church and separating it from other religions.  Mr. Ilioi further testified that the law did not grant equal rights to religions, and it encouraged the treatment of Pentecostals in Romania as an inferior group of people.  He testified, however, that his religion was recognized as a religion in Romania before the Romanian revolution in 1989 and, therefore, the Religion Law, which recognized the Pentecostal church as a religion, had no change in this regard.[1]

---

[1]    The U.S. Department of State International Religious Freedom Report 2007 for Romania states that the Religion Law recognized eighteen "religions," which included the Pentecostal Church.  *See* R. at 342-43.

In support of his application, Mr. Ilioi claimed that two "changed circumstances" materially affected his eligibility for asylum: 1) becoming an ordained bishop in October 2006; and 2) passage of the Religion Law. He testified that he fears returning to Romania, where the marginalization of Pentecostals is ingrained in the culture, as the Religion Law has had no effect in promoting religious freedom. He claimed that although not impossible, it would be difficult to find employment among the predominately Orthodox employers. And he claimed he would not be able to continue his religious leadership activities.

The IJ found Mr. Ilioi credible, but he held that Mr. Ilioi had not established the requisite changed circumstances for an exception to the one-year period to file an asylum application. The IJ did not consider the Religion Law as a changed circumstance because he found the law recognized Pentecostalism as a valid religion. He found Mr. Ilioi's ordination could qualify as a changed circumstance but that an eighteen-month delay in filing the asylum application was unreasonable. The IJ accordingly pretermitted Mr. Ilioi's asylum application as untimely. The IJ further found Mr. Ilioi failed to establish past persecution or future persecution in the context of his claim for restriction on removal and denied the claim. He also denied relief under the CAT, but he granted Mr. Ilioi voluntary departure. The BIA affirmed the IJ's decision. Mr. Ilioi now petitions for review.

Before this Court, Mr. Ilioi argues 1) the BIA erred in affirming the IJ's determination that his asylum application was untimely; and 2) he established past

persecution and a clear probability of future prosecution. Mr. Ilioi does not seek review of the denial of relief under the CAT.

## II. Discussion

"Where, as here, a single BIA member issues a brief order, affirming . . . the IJ's order . . . such an order constitutes the final order of removal . . . and thus this Court will not affirm on grounds raised in the IJ decision unless they are relied upon by the BIA in its affirmance." *Rivera-Barrientos v. Holder*, 666 F.3d 641, 645 (10th Cir. 2012) (alterations in original) (internal quotation marks omitted). While we review the BIA's decision, not the IJ's, "we may consult the IJ's opinion to the extent that the BIA relied upon or incorporated it." *Sarr v. Gonzales*, 474 F.3d 783, 790 (10th Cir. 2007).

"[W]e review the [BIA's] findings of fact under the substantial evidence standard." *Elzour v. Ashcroft*, 378 F.3d 1143, 1150 (10th Cir. 2004). Under this standard, "[t]he BIA's findings of fact are conclusive unless the record demonstrates that any reasonable adjudicator would be compelled to conclude to the contrary." *Yuk v. Ashcroft*, 355 F.3d 1222, 1233 (10th Cir. 2004) (internal quotation marks omitted). We review the BIA's legal conclusions de novo. *Elzour*, 378 F.3d at 1150.

### A. Asylum

Mr. Ilioi seeks review of the finding that his asylum application was untimely. The INA requires that an applicant "demonstrate[] by clear and convincing evidence that the application has been filed within 1 year after the date of the alien's arrival in

the United States." 8 U.S.C. § 1158(a)(2)(B). This filing deadline is subject to exceptions in cases when the alien demonstrates "either the existence of changed circumstances which materially affect the applicant's eligibility for asylum or extraordinary circumstances relating to the delay in filing an application." *Id*. § 1158(a)(2)(D). The term "changed circumstances" includes "[c]hanges in conditions in the applicant's country of nationality" or "[c]hanges in the applicant's circumstances . . . including . . . activities the applicant becomes involved in outside the country of feared persecution that place the applicant at risk." 8 C.F.R. § 1208.4(a)(4)(i)(A),(B). An applicant claiming changed circumstances must further demonstrate that the application was filed "within a reasonable period given those 'changed circumstances.'" *Id*. § 1208.4(a)(4)(ii). Additionally, if an applicant establishes that "he or she did not become aware of the changed circumstances until after they occurred, such delayed awareness" shall be considered by the adjudicator in determining a reasonable period. *Id*.

We do not, however, have jurisdiction to review discretionary determinations concerning changed or extraordinary circumstances, 8 U.S.C. § 1158(a)(3); *Ferry v. Gonzales*, 457 F.3d 1117, 1130 (10th Cir. 2006), unless those determinations raise a constitutional issue or question of law, 8 U.S.C. § 1252(a)(2)(D), *Diallo v. Gonzales*, 447 F.3d 1274, 1281 (10th Cir. 2006). Questions of law refers to "issues regarding statutory construction." *Diallo*, 447 F.3d at 1282 (internal quotation marks omitted). We will, however, reject attempts to overcome the jurisdictional bar by trying to

"shoehorn [a] claim into the 'question of law' category" when it "simply does not fit there." *Vasile v. Gonzales*, 417 F.3d 766, 768 (7th Cir. 2005).

The BIA affirmed the IJ's determination that Mr. Ilioi was not eligible for asylum because his application was not filed within the one-year deadline. The BIA concluded that even assuming changed circumstances, the application, filed sixteen months after the Religion Law took effect and eighteen months after Mr. Ilioi became an ordained pastor, was not filed within a reasonable period after those changed circumstances. *See* 8 C.F.R. § 1208.4(a)(4)(ii). Mr. Ilioi attempts to couch his issues as questions of law. He asserts the IJ committed legal error by using a numerical calculation to determine whether his application was filed within a reasonable period, instead of evaluating Mr. Ilioi's delayed awareness of the changed circumstances as required under 8 C.F.R. § 1208.4(a)(4)(ii). *See* Aplt. Opening Br. at 24-25. Mr. Ilioi claims to have delayed awareness of his changed circumstance regarding the Religion Law. He claims that the consequences of the Religion Law only "became clear" or "crystalized" in January 2008 with the death of a Baptist advocate for religious freedom in Romania.[2] *Id.* at 21, 30. He claims legal error by the BIA in failing to review de novo the standard used by the IJ and in committing the same legal error as the IJ. *See id.* at 24-25.

---

[2]   Mr. Ilioi testified that the advocate opposed the proposed Religion Law, had been attacked by the press and national newspapers in Romania, and died of a heart attack. *See* R. at 195.

Review of the record demonstrates that Mr. Ilioi did not thoroughly raise the issue of delayed awareness of the Religion Law to the IJ.[3] And although he raised the issue for the first time to the BIA, we conclude that this contention does not raise a constitutional issue or question of law involving statutory construction. The BIA's reasonableness determination is a discretionary determination and, accordingly, Mr. Ilioi's challenge is one to the agency's discretionary and fact-finding exercises. *See Kechkar v. Gonzales*, 500 F.3d 1080, 1084 (10th Cir. 2007). Mr. Ilioi's other arguments alleging that the BIA committed legal error in failing to consider the materiality of the Religion Law likewise fail to raise a question of law. *See Almuhtaseb v. Gonzales*, 453 F.3d 743, 748 (6th Cir. 2006) (stating that the "existence of changed circumstances that materially affect eligibility for asylum is a predominately factual determination").

Because Mr. Ilioi failed to assert a reviewable question of law, we lack jurisdiction to review the BIA's timeliness determination, and this portion of the petition is dismissed for lack of jurisdiction. Mr. Ilioi's arguments concerning the merits of his asylum claim, and alleged errors, cannot be heard.[4]

---

[3] In a pre-hearing brief to the IJ, in one sentence, Mr. Ilioi stated only that "[the] delay in filing was reasonable given that Mr. Ilioi became aware of the new law's ramifications only shortly before that time [April 2008]." R. at 296. He did not claim that he became aware of the consequences of the law in January 2008 with the death of the Baptist advocate. He did not testify to this assertion either.

[4] Mr. Ilioi includes arguments targeting his asylum claim, i.e., that he established past persecution and, accordingly, this created a rebuttable presumption of future persecution that the government failed to rebut. *See* Aplt. Opening Br. at

(continued)

## B. Restriction on Removal

We retain jurisdiction to review the denial of Mr. Ilioi's request for restriction on removal under 8 U.S.C. § 1231(b)(3). *See Tsevegmid v. Ashcroft*, 336 F.3d 1231, 1235 (10th Cir. 2003) (superseded on other grounds by statute (8 U.S.C. § 1252(a)(2)(D))). Unlike asylum, restriction on removal is not subject to a filing deadline. *See Wei v. Mukasey*, 545 F.3d 1248, 1250 (10th Cir. 2008); 8 C.F.R. § 1208.4(a). An alien may not be removed to a particular country if he can establish that his "life or freedom would be threatened in the country of removal because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." *Sidabutar v. Gonzales*, 503 F.3d 1116, 1123 (10th Cir. 2007) (alterations and internal quotation marks omitted); 8 U.S.C. § 1231(b)(3)(A).

> An alien may create a rebuttable presumption of eligibility for restriction on removal by either (1) demonstrating past persecution in the proposed country of removal on account of one of the protected grounds; or (2) showing that it is more likely than not that the alien would be subject to persecution on one of the specified grounds upon returning to the proposed country of removal.

*Sidabutar*, 503 F.3d at 1123-24 (citations and internal quotation marks omitted).

---

30, 45. He also claims to be eligible for "humanitarian asylum" under 8 C.F.R. § 1208.13(b)(1)(iii)(A). *See* Aplt. Opening Br. at 46; *see also Vicente-Elias v. Mukasey*, 532 F.3d 1086, 1092 (10th Cir. 2008) (stating that "alien may seek 'humanitarian asylum' based exclusively on past persecution so severe that it demonstrates compelling reasons for being unwilling to return" (internal quotation marks omitted)). As noted, we lack jurisdiction to consider the merits of Mr. Ilioi's asylum application. However, there appears to be some overlap in Mr. Ilioi's arguments concerning relief in the form of restriction on removal. To the extent possible, we will construe his asylum arguments as restriction on removal arguments.

"The test for restriction on removal is . . . more demanding than the well-founded fear standard applicable to an asylum claim." *Ritonga v. Holder*, 633 F.3d 971, 978 (10th Cir. 2011) (internal quotation marks omitted). Whereas a grant of asylum is discretionary, "restriction on removal is granted to qualified aliens as a matter of right." *Ismaiel v. Mukasey*, 516 F.3d 1198, 1204 (10th Cir. 2008).

In declining to find past persecution, the BIA agreed with the IJ that the harm suffered by Mr. Ilioi as a child – verbal taunts and ridicule by grade school classmates and teachers and beatings – constituted harm in the form of harassment and discrimination but did not rise to the level of persecution.

Mr. Ilioi raises numerous arguments challenging the BIA's determination that he failed to demonstrate past persecution. Citing *Jorge-Tzoc v. Gonzales*, 435 F.3d 146 (2d Cir. 2006), Mr. Ilioi first argues that the BIA erred in evaluating his past persecution claim because it did not assess the claim from the perspective of a child and, therefore, applied an incorrect legal standard. But Mr. Ilioi did not argue to the BIA that the claim should be evaluated from the perspective of a child. Accordingly, we lack jurisdiction to review this argument. *See Sidabutar*, 503 F.3d at 1118 ("[W]e generally assert jurisdiction only over those arguments that a petitioner properly presents to the BIA.").

Mr. Ilioi next argues that the BIA failed to consider that the "persecutor's motive was to stop the practice of religion." Aplt. Opening Br. at 36. He also claims the BIA failed to consider the entire record in assessing his past persecution claim.

- 10 -

Specifically, he claims the BIA did not consider evidence concerning the arrest of Mr. Ilioi's parents and the attempted demolition of his church. *See id*. at 40-41. We reject these arguments.

The harm Mr. Ilioi experienced as a child – including being taunted, ridiculed, and beaten by teachers at grade school for being Pentecostal, and having rocks thrown at him by schoolmates – does not rise to the level of persecution. Persecution is the "infliction of suffering or harm . . . in a way regarded as offensive and requires more than just restrictions or threats to life and liberty." *Yuk*, 355 F.3d at 1233 (internal quotation marks omitted). Taunts and ridicule do not constitute persecution. *See Witjaksono v. Holder*, 573 F.3d 968, 977 (10th Cir. 2009) ("Verbal taunts, while offensive, fall within the bounds of harassment and discrimination, not persecution."); *see also Sidabutar*, 503 F.3d at 1124 (finding that multiple beatings by Muslim classmates, two involving serious injury, and repeated confrontations by people demanding money, all on account of Indonesian alien's Christian religion did not amount to persecution).

We further discern no error with the BIA's evaluation of the record. Regarding Mr. Ilioi's parents' arrests, the IJ expressly considered and rejected the arrests as constituting past persecution, and the BIA cited the IJ's decision. *See* R. at 4. Accordingly, the BIA did not fail to consider this evidence. Further, although the BIA did not address the attempted demolition of Mr. Ilioi's church, it "is not required to write an exegesis on every contention." *Ismaiel*, 516 F.3d at 1207

(internal quotation marks omitted).  All that is required is a decision that sets out "terms sufficient to enable a reviewing court to perceive that it has heard and thought and not merely reacted."  *Id.* (internal quotation marks omitted).

We have reviewed the record and we conclude that the evidence does not compel a result contrary to the BIA's finding that Mr. Ilioi failed to establish past persecution.  *See id.* at 1204 (noting agency's finding of fact conclusive unless "any reasonable adjudicator would be compelled to conclude to the contrary" (internal quotation marks omitted)).

Turning to Mr. Ilioi's claim of future persecution, he bases his claim on an alleged inability to practice his religion and leadership activities if removed to Romania.  On appeal, he first argues that he is entitled to a presumption of future persecution based on his showing of past persecution.  *See* Aplt. Opening Br. at 50-51; 8 C.F.R. § 1208.16(b)(1)(i) (stating if alien demonstrates past persecution, "it shall be presumed that [his] life or freedom would be threatened in the future in the country of removal").  The IJ and the BIA did not find a showing of past persecution and we uphold this determination.  Accordingly, contrary to Mr. Ilioi's assertion, he is not entitled to a presumption of future persecution.  Nor did the BIA err in failing to consider whether the government met its burden in rebutting the presumption of future persecution when past persecution was not found in the first instance.

Mr. Ilioi next faults the agency for using a wrong legal standard to assess his religious persecution claim. *See* Aplt. Opening Br. at 53, 59-60. In support, he cites *Muhur v. Ashcroft*, 355 F.3d 958, 960-61 (7th Cir. 2004), which held that being forced to abandon or conceal one's religion may be religious persecution. He faults the BIA for failing to "consider his testimony that he would have to give up the practice of his religion," if forced to return to Romania, and, further, for assessing only evidence of economic hardship. Aplt. Opening Br. at 60. Mr. Ilioi's arguments are unavailing.

The record does not support that Mr. Ilioi testified, or argued for that matter, that he would "have to give up the practice of his religion." He did testify that he did not believe he could pastor anymore in Romania but explained that this was because it would be "difficult to start in a past [sic] country you don't know the system, you don't know the people." R. at 215. Further, the BIA's decision reflects, as the IJ's, that the BIA considered that Mr. Ilioi's family members had been subjected to arrests in the past on account of their religion but that the record evidence did not demonstrate any continuing restrictions on their religious activities in Romania. *See also Yuk*, 355 F.3d at 1234 (reasonableness of an alien's fear of harm is lessened when family members remain in his country without experiencing harm). The record does not support that Mr. Ilioi would have to conceal the practice of his religion or would be "barred" from practicing. Substantial evidence supports the agency's

determination that Mr. Ilioi has failed to show that it is more likely than not that he would be persecuted for his religious beliefs if removed to Romania.

### III.   Conclusion

We dismiss for lack of jurisdiction Mr. Ilioi's challenge to the BIA's asylum determination.  We deny the remainder of the petition for review.

Entered for the Court


Monroe G. McKay
Circuit Judge